UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| **CYNTHIA M. RODRIGUEZ,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. V-09-54** |
| | § | |
| **FLOW-ZONE, LLC,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION & ORDER

Pending before the Court is Defendant Flow-Zone LLC's ("Flow-Zone") Motion for Summary Judgment (Dkt. No. 15), to which Plaintiff Cynthia M. Rodriguez ("Rodriguez") has responded (Dkt. No. 16), and Flow-Zone has replied (Dkt. No. 18). Having considered the motion, response, reply, record, and applicable law, the Court is of the opinion that Flow-Zone's Motion for Summary Judgment should be **GRANTED** in part and **DENIED** in part.

## I. Background

Flow-Zone is a distributor of instrumentation and controls for the oil and gas industries. Rodriguez worked as an outside sales representative at Flow-Zone's Victoria, Texas site from May 12, 2008 to August 13, 2008. Rodriguez claims that during her 3-month employment with Flow-Zone, she was subjected to a sexually hostile work environment by fellow employee Joseph San Miguel ("San Miguel").

Rodriguez alleges that San Miguel started sexually harassing her during her first two weeks on the job. Rodriguez detailed the alleged harassment in a letter she sent to Flow-Zone sometime around July 16, 2008.[1] In her letter, Rodriguez complained that:

---

[1]. Although the stated date on the letter is July 15, 2008, it references events that occurred on the morning of July 16, 2008. The Court will assume the letter was sent to Flow-Zone on July 16 at the very earliest.

1

- On one occasion, San Miguel showed her downloaded photographs of women in underwear and an enlarged photo of a woman's vagina.

- San Miguel often stared at her chest.

- While listening to music at the office one day, San Miguel turned up the song "Promiscuous Girl" and told her to climb on his desk and he would "throw dollar bills at her." Then San Miguel told her, "Take of your shirt [and] if I like what I see, I'll send Abraham to get me some more ones."

- On Friday, July 11, 2008, San Miguel tried to kiss her. After she pushed him away and asked, "What the hell is wrong with you?," he laughed and grabbed her arm. The following Tuesday, she reported the attempted kiss to her immediate supervisor, Branch Manager Chris Dulock, who said he would tell San Miguel that such behavior was unacceptable.

- On Wednesday, July 16, 2008, San Miguel demanded invoices from Rodriguez, loudly laughed and joked with another male employee, and left the toilet seat up in the women's restroom at least twice. After the second time Rodriguez discovered the seat up, she began to cry uncontrollably.

(Rodriguez 7/16/2008 Letter to Flow-Zone, Dkt. No. 16, Ex. B-1.)

The following day, on July 17, 2008, Rodriguez filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging that between the date of her hire and July 16, 2008, she had been sexually harassed by a co-worker and complained to her manager about the behavior, but the employee continued to subject her to sexually offensive comments and gestures. (EEOC Charge, Dkt. No. 16, Ex. 5.) When Dulock informed San Miguel of Rodriguez' allegations against him, San Miguel stated, "This is completely and totally false and I believe this is just an employee being angry." (Dulock Decl. No. 1, Dkt. No. 15, Ex. B ¶ 8.) Dulock nonetheless issued San Miguel a written warning with the action taken as "one on one conversation with employee, limited interaction between employee [and] accuser, distribution on policy [and] posting of policy, close supervision of parties." (San Miguel Employee Warning Notice, Dkt. No. 15, Ex. B-2.)

2

A number of events occurred the following day—Friday, July 18, 2008. First, Flow-Zone Controller and "Human Resources Employee" Amenna Mingau[2] sent Rodriguez a letter stating that Flow-Zone had received her complaint of sexual harassment and was in the process of conducting a full investigation. (Mingau 7/18/08 Letter to Pl., Dkt. No. 16, Ex. 3.) In the meantime, Flow-Zone expected Rodriguez to report for work and conduct Flow-Zone's business in the capacity for which she was hired. (*Id.*) The letter also informed Rodriguez that she was not authorized to use her personal vehicle for work purposes because it was not covered under Flow-Zone's insurance policy, but was to use her work vehicle to conduct business. (*Id.*) The admonition regarding use of her personal vehicle reiterated the verbal and written warnings for "insubordination" and "tardiness" Rodriguez also received that day, in which Dulock stated that he "asked [Rodriguez] to arrive at work at 8:00AM on 7/18/08, pick up her company truck and make sales calls. Without calling she arrives at work at approx. 9:30AM and said she was making sales calls in her personal vehicle." (Pl. Employee Warning Notice, Dkt. No. 16, Ex. 4.)

Later that same day, Rodriguez was taken to the emergency room by ambulance after she suffered a panic attack. (Pl. Medical Records, Dkt. No. 16, Ex. 14 at 9.) According to Rodriguez' medical records, the attack was "triggered by 'sexual harassment' at work prior to coming in." (*Id.*) While at the hospital, Rodriguez requested that staff call the police so that she could report the harassment. (Pl. Emergency Room Records, Dkt. No. 16, Ex. 13 at 4.) In addition to repeating the same allegations against San Miguel that she detailed in her letter to Flow-Zone, Rodriguez also complained to Deputy Sheriff Randy Williams about the following behavior:

- Approximately two to three weeks after Rodriguez was hired, she overheard San Miguel tell another coworker who was having problems with his girlfriend to "put a bullet in her head and that will take care of that problem."

---

2. Mingau described herself as the "human resources employee" and explained that because the controller she replaced had previously assumed the human resources duties, "that kind of fell in [Mingau's] scope." (Mingau Dep., Dkt. No. 16, Ex. 15 at 8:13-15.) Mingau admittedly had no training in human resources. (*Id*. at 8:18-20.)

3

- San Miguel flirted with her and remarked that he wanted her to wear low-cut shirts in the front because it "makes your breasts look good."

- On several other occasions, San Miguel made lewd remarks and exhibited lewd behavior towards her.

- On one occasion, San Miguel was walking behind Rodriguez when she "felt a presence. As she continued to walk, she turned around and found [San Miguel] right behind her, almost in step, as if to be attempting to rub his body against her."

- With respect to the attempted kiss, Rodriguez told the officer that "she continually pushed and pulled away from [San Miguel] until breaking free. She told [him] repeatedly 'No.'"

(Deputy Williams' Report, Dkt. No. 12 at 4—5.) As soon as Deputy Williams was finished speaking with Rodriguez, he went to Flow-Zone's Victoria site to issue San Miguel a citation for assault by contact.[3] (*Id.* at 7.) According to Deputy Williams' report, Dulock was present and remarked several times, "This thing keeps getting bigger and bigger each time she tells it. I can't believe this." (*Id.*)

On the night of July 18, 2008, Rodriguez' husband called Dulock to inform him that Rodriguez was under a physician's care. (Dulock Decl. ¶ 4.) The following Monday, Mingau sent Rodriguez a letter stating that Flow-Zone was in receipt of her letter dated July 15, 2008 describing her sexual harassment allegations against San Miguel in greater detail and would continue to thoroughly investigate her complaints. (Mingau 7/21/08 Letter to Pl., Dkt. No. 16, Ex. 6.) The letter further stated that because of Rodriguez' hospital visit on July 18, she would have to get a doctors note releasing her before she could report back for duty. (*Id.*) The letter went on to explain that Flow-Zone needed to know no later than July 25 whether Rodriguez had been cleared by a physician, and further stated that Flow-Zone expected her to continue to perform the duties she was hired to do. (*Id.*)

---

3. A justice of the peace later found San Miguel not guilty of assault. (Rodriguez Dep. at 55:4-8.)

4

Rodriguez underwent a psychiatric evaluation administered by Dr. John M. Bouras on July 23, 2008. (Bouras 7/23/08 Letter to Torres, Dkt. No. 16, Ex. 7.) Dr. Bouras diagnosed Rodriguez with major depression, post-traumatic stress disorder, and borderline personality disorder, and he recommended that she continue therapy with Kay Torres, LCSW. (*Id.*) Two days later, Torres faxed Dulock a letter stating that Rodriguez was not released to work at that time, but that she expected Rodriguez' release date to be August 11, 2008. (Torres 7/25/08 Letter to Dulock, Dkt. No. 16, Ex. 8.) Roughly one week after Torres wrote to Flow-Zone, Dr. Bouras informed Flow-Zone that Rodriguez was currently under his care and unable to work at that time. (Bouras 7/31/08 Letter to Whom It May Concern, Dkt. No. 16, Ex. 9.)[4] Dr. Bouras' letter did not provide an anticipated release date. (*Id.*)

While Rodriguez was on medical leave, Flow-Zone conducted an investigation into San Miguel's computer usage while on company time and using company equipment. (Myers Decl., Dkt. No. 15, Ex. C ¶ 4.) On July 28, 2008, "explicit and inappropriate subject matter" was found on San Miguel's company computer. (San Miguel Termination Letter, Dkt. No. 18, Ex. 3.) Two days later, San Miguel admitted to his immediate supervisor that he had viewed inappropriate material on his work computer. (*Id.*) As a result, Flow-Zone terminated San Miguel's employment on Friday, August 8, 2008. (*Id.*)

Based on Torres' statement that she expected Rodriguez to be released for work on August 11, 2008, Flow-Zone claims that Rodriguez was scheduled to return to work on August 12, 2008. When Rodriguez did not report for work by the end of the day on August 13, 2008, Operations Manager Randy Myers informed her by letter that Flow-Zone was terminating her employment for failing to report to work for her regularly scheduled shift and failing to notify

---

4. Flow-Zone complains that Rodriguez has presented no evidence that Flow-Zone actually received Dr. Bouras' letter. However, Flow-Zone has not denied that it received Dr. Bouras letter.

5

her supervisor of unscheduled absences. (Pl. Termination Letter, Dkt. No. 15, Ex. C-2.) Specifically, the letter stated that "Flow-Zone view[ed] [her] misconduct as violations of company policies and job abandonment/voluntary termination." (*Id.*) On August 27, 2008, Torres sent Dulock another letter stating that Rodriguez had "some serious trauma symptoms from the events that occurred at work and [was] not able to return to that environment at [that] time." (Torres 8/27/08 Letter to Dulock, Dkt. No. 16, Ex. 11.) Rodriguez was never reinstated.

Roughly one year later, on August 8, 2009, Plaintiff filed suit against Flow-Zone in the 24th District Court of Victoria County, Texas alleging claims of sexual harassment and retaliation under both Title VII and the Texas Commission on Human Rights Act (TCHRA),[5] as well as workers compensation and gender discrimination. Flow-Zone removed the action to this Court on August 21, 2009. Rodriguez has since conceded that her workers compensation and gender discrimination claims should be dismissed. (Dkt. No. 16 at 1 n.1.) Flow-Zone now moves for summary judgment on Rodriguez' remaining claims.

## II. Standard of Review

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Christopher Village, LP v. Retsinas*, 190 F.3d 310, 314 (5th Cir. 1999). "For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718—19 (5th Cir. 1995); *see also Celotex Corp. v. Catrett*, 477

---

5. In all respects material to Flow-Zone's Motion for Summary Judgment, these statutes are the same. *See Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001) (Texas courts look to federal statutes, regulations, and cases for guidance in adjudicating claims under the TCHRA).

6

U.S. 317, 323—25 (1986). To prevent summary judgment, the non-movant must "respond by setting forth specific facts" that indicate a genuine issue of material fact. *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999).

When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant. *See Samuel v. Holmes*, 138 F.3d 173, 176 (5th Cir. 1998); *Texas v. Thompson*, 70 F.3d 390, 392 (5th Cir. 1995). "The court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991). However, the non-movant cannot avoid summary judgment by presenting only "conclusory allegations" or "unsubstantiated assertions," such as the bare allegations of a complaint, but must present sufficient evidence, such as sworn testimony in a deposition or affidavit, to create a genuine issue of material fact as to the claim asserted. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). "Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that 'the better course would be to proceed to a full trial.'" *Freeman v. U.S.*, 2005 WL 3132185, *2 (S.D. Tex. Nov. 22, 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

### III.  Discussion

#### A. Hostile Work Environment Sexual Harassment

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Sexual harassment is a form of sex discrimination under Title VII, and the United States Supreme Court has recognized two types of sexual harassment claims: (1) those based on requests for sexual favors that result in adverse employment actions and (2) those where bothersome attentions or sexual remarks create a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). Here, Rodriguez claims that San Miguel's repeated sexual advances toward her created a hostile work environment.

A plaintiff who asserts a Title VII hostile work environment claim must establish that: (1) she belongs to a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take remedial action. *Septimus v. Univ. of Houston*, 399 F.3d 601, 611 (5th Cir. 2005). For purposes of its motion for summary judgment, Flow-Zone does not dispute that Rodriguez belongs to a protected class or that she was subjected to unwelcome harassment based on her sex. According to Flow-Zone, however, Rodriguez' allegations do not rise to the level of severe and pervasive conduct required to show that the harassment affected a term, condition, or privilege of her employment.

To affect a term, condition, or privilege of employment, the harassing conduct "'must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Aryain v. Wal-Mart Stores of Tex., LP*, 534 F.3d 473, 479 (5th Cir. 2008) (quoting *Lauderdale v. Tex. Dept. of Criminal Justice*, 512 F.3d 157, 163 (2007)) (alteration in original). Whether an environment is hostile or abusive enough to support a hostile

work environment claim depends on a totality of circumstances. *Green v. Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 655—56 (5th Cir. 2002), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). When examining the totality of the circumstances, a court should focus on such factors as: (1) the frequency of the conduct; (2) its severity; (3) the degree to which the conduct is physically threatening or humiliating; and (4) the degree to which the conduct unreasonably interferes with an employee's work performance. *Id.*; *see also Septimus*, 399 F.3d at 611. The work environment must also be deemed "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Aryain*, 534 F.3d at 479 (quoting *Faragher*, 524 U.S. at 787).

"Incidental, occasional or merely playful sexual utterances will rarely poison the employee's working conditions to the extent demanded for liability. Discourtesy or rudeness, 'offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in terms and conditions of employment.'" *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (5th Cir. 1999) (quoting *Faragher*, 524 U.S. at 787). To the contrary, "[a]ll of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment." *Id.* (citing *Faragher*, 524 U.S. 775; *Ellerth*, 524 U.S. 742; *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986)); *see also Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004). "The extreme facts recited in those cases highlight the intensity of the objectionable conduct that must be present in order to constitute an actionable hostile environment claim." *Indest*, 164 F.3d at 264.

Here, Rodriguez alleges that San Miguel: once showed her downloaded photographs of women in underwear and an enlarged photo of a woman's vagina; once told another co-worker, within earshot, that "if he had problems . . . with a woman, he would simply put a gun to her head and the problem would be over;" repeatedly used the women's restroom and left the toilet seat up; repeatedly made lewd comments about her clothing, specifically that he liked how her breasts looked in low-cut shirts; and once propositioned her to take off her shirt and dance on his desk like a stripper. Rodriguez also alleges that on one occasion, San Miguel tried to kiss her and then grabbed her arm and laughed after she pushed him away.

Even if Rodriguez were able to prove all of these allegations at trial, such behavior—although boorish and insensitive—is insufficient as a matter of law to constitute conduct so "severe or pervasive" as to alter the conditions of Rodriguez' employment. As Flow-Zone recognized in its motion for summary judgment, the Fifth Circuit has affirmed dismissal of female plaintiffs' hostile work environment claims on facts far more egregious than these. *See e.g.*, *Barnett v. Boeing Co.*, 306 Fed. App'x 875, 879 (2009) (unpublished) (employee failed to establish sexual harassment was sufficiently severe or pervasive, despite evidence that a male co-worker leered at her, touched her in sexually inappropriate and unwelcome ways, and actively intimidated her after she complained of his actions); *Hockman v. Westward Commc'ns LLC*, 407 F.3d 317, 328 (5th Cir. 2004) (male co-worker's actions of making one remark to the plaintiff about another employee's body, slapping the plaintiff on her behind with a newspaper, grabbing or brushing against the plaintiff's breast and behind, attempting to kiss the plaintiff on one occasion, and standing in the door of the women's bathroom while the plaintiff was washing her hands were isolated, non-serious events that did not qualify as a hostile work environment); *Shepherd v. Comptroller of Public Accounts*, 168 F.3d 871, 872 (5th Cir. 1999) (male co-

worker's conduct was not severe or pervasive where he once remarked that plaintiff's elbows were the same color as her nipples, once told her she had big thighs while pretending to look up her dress, stood over her desk on several occasions and attempted to look down her clothing, touched her arm and rubbed her shoulder on several occasions, and on two occasions patted his lap and said "here's your seat" after she arrived late for office meetings); *Indest*, 164 F.3d at 265 (supervisor's "misbehavior" was neither severe nor pervasive where "[h]is vulgar remarks and innuendos (about his own anatomy) were no more offensive than sexual jokes regularly told on major network television programs").

    Plaintiff nonetheless claims that San Miguel's harassment was severe enough to interfere with her ability to perform at work, as it caused her to cry and be distraught, call the police, leave work, become hospitalized, and be diagnosed by a physician with PTSD and major depression. However, Plaintiff's own letter to Flow-Zone reveals that the behavior by San Miguel that "caused her to cry and to be distraught" on July 16, 2008 was a combination of San Miguel demanding invoices for a work-related matter, being loud and joking with another employee, and leaving the toilet seat up yet again. (Pl. 7/16/08 Letter to Flow-Zone at 3.) While such conduct might be annoying or rude, it has nothing to do with Rodriguez' sex. Plaintiff further claims that summary judgment is precluded because Flow-Zone "admit[ted] the offensive nature of the conduct" when Mingau stated in her deposition that, based on the allegations made by Rodriguez, she believed the incidents were "serious." (Dkt. No. 16 at 18—19 (citing Mingau Dep. at 89:22—90:6).) However, the opinion of one employee—who was admittedly untrained in the field of human resources—that San Miguel's conduct was "serious" does not mean that it was "severe and/or pervasive" as a matter of law.

11

The Court recognizes that "there is no mathematical formula to determine whether conduct is sufficiently severe or pervasive to establish a hostile-work-environment claim." *Donaldson v. CDB Inc.*, 335 Fed. App'x 494, 502 (5th Cir. 2009). However, in light of the demanding standard set forth by the Supreme Court and Fifth Circuit, the Court cannot conclude that San Miguel's alleged conduct created a working environment that was sexually abusive overall.

Because Rodriguez is unable to establish the required fourth element of her *prima facie* case—that the harassment affected term, condition, or privilege of employment—the Court need not decide whether Flow-Zone knew or should have known of the harassment and failed to take remedial action under the fifth element. Accordingly, Flow-Zone's motion for summary judgment as to Rodriguez' sexual harassment claim is **GRANTED**.

### B. Retaliation

Even though San Miguel's conduct was not so severe and pervasive as to create a hostile work environment as recognized under existing law, Rodriguez may still be entitled to recovery if Flow-Zone retaliated against her for reporting what she believed to be sexual harassment in violation of Title VII. *See* 42 U.S.C. § 2000e-3(a). In order to make out a *prima facie* case for retaliation, a plaintiff must establish: "(1) the employee has engaged in activity protected by Title VII; (2) the employer took adverse employment action against the employee; and (3) a causal connection exists between that protected activity and the adverse employment action." *Burger v. Cent. Apartment Mgmt., Inc.*, 168 F.3d 875, 878 (5th Cir. 1999). Once the plaintiff sets forth this *prima facie* case, "'the burden then shifts to the employer to articulate a legitimate . . . non-retaliatory reason for its employment action.'" *Aryain*, 534 F.3d at 484 (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007). If the employer meets this burden of production,

the plaintiff then bears the burden of proving that the employer's reason is a pretext for the actual retaliatory reason. *Id.*

Flow-Zone does not dispute that Rodriguez engaged in protected activity when she filed a sexual harassment complaint with the EEOC, or that an adverse employment action was taken against Rodriguez when she was terminated from her position. However, Flow-Zone disputes that there was any causal nexus between Rodriguez' protected activity and discharge. To the contrary, Flow-Zone maintains that it has offered a legitimate, non-discriminatory reason for discharging Rodriguez: job abandonment.

### 1. Whether there is a causal link between Rodriguez' complaint and any adverse employment action

As the Fifth Circuit has noted, "At first glance, the ultimate issue in an unlawful retaliation case—whether the defendant discriminated against the plaintiff *because* the plaintiff engaged in conduct protected by Title VII—seems identical to the third element of the plaintiff's *prima facie* case—whether a *causal* link exists between the adverse employment action and the protected activity." *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996) (emphasis in original). However, the two questions have quite different standards of proof. *Id.* The standard for establishing the "causal link" element of the plaintiff's *prima facie* case is much less stringent than the ultimate "but for" standard necessary to prevail in a Title VII case. *Id.*; *see also Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463, 471 (5th Cir. 2002); *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001). "The plaintiff 'need not prove that her protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'causal link' element of a *prima facie* case.'" *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002) (quoting *Long*, 88 F.3d at 305 n.4). Instead, the plaintiff merely needs to show some connection between the protected activity and the adverse employment action to establish a *prima facie* case. *Id.*

13

"'[T]he mere fact that some adverse action is taken after an employee engages in some protected activity will not always be enough for a *prima facie* case.'" *Raggs*, 278 F.3d at 471 (quoting *Swanson v. General Servs. Admin.*, 110 F.3d 1180, 1188 n.3 (5th Cir.1997)). However, "a close temporal proximity between the protected conduct and the adverse employment action may be sufficient to satisfy the causal connection prong of the *prima facie* case." *Handzlik v. United State*, 93 Fed. App'x 15, 19 (5th Cir. 2004) (unpublished) (citing *Evans*, 246 F.3d at 354).

Rodriguez points to the chronology of events as evidence that her complaint was causally connected to her termination. It is undisputed that on July 17 or 18, 2008, Flow-Zone was informed that Rodriguez had filed a Charge of Discrimination with the EEOC. It is further undisputed that within one day of receiving Rodriguez' complaint, Flow-Zone issued Rodriguez both verbal and written warnings for the first time during her employment. In fact, one such reprimand was made in the very same letter Flow-Zone sent to Rodriguez acknowledging receipt of her sexual harassment complaint. Then on August 13, 2008—less than one month after Rodriguez' filed her EEOC Charge—Flow-Zone terminated her employment.

Drawing all reasonable inferences in favor of Rodriguez, a reasonable juror could find the existence of a causal link between Rodriguez' EEOC complaint and her termination based on the timing of the events in this case. *See, e.g.*, *LeMaire v. Louisiana Dept. of Transp. & Development*, 480 F.3d 383, 390 (5th Cir. 2007) (timing of employee's suspension approximately two weeks after his report of sexual harassment suggested causal connection); *Bregon v. Autonation USA Corp.*, 128 Fed. App'x 358, 361—62 (5th Cir. 2005) (unpublished) (fact that employee was fired only a week after he filed EEOC charge was sufficient to satisfy employee's *prima facie* burden); *Handzlik*, 93 Fed. App'x at 19 (two months time lapse between EEOC complaint and adverse employment action sufficient to establish causal link).

Accordingly, the Court finds that Rodriguez has set forth a *prima facie* case of retaliation.

**2. Whether Flow-Zone's proffered reason is pretextual**

Because Rodriguez has established her *prima facie* case of retaliation, the burden of producing some non-retaliatory reason for its action falls upon Flow-Zone. Then, if Rodriguez "presents evidence supporting the *prima facie* case, plus evidence that the reasons given by the employer for the adverse employment action were pretextual, a jury may infer the existence of retaliation." *Mota v. Univ. of Texas Houston Health Science Ctr.*, 261 F.3d 512, 519—20 (5th Cir. 2001) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000); *Ratliff v. City of Gainesville*, 256 F.3d 355 (5th Cir. 2001)).

Here, Flow-Zone claims that it terminated Rodriguez' employment because she failed to notify her supervisor each day for two consecutive absences. According to Flow-Zone, because Rodriguez "undoubtedly violated Flow-Zone policy, Flow-Zone had a legitimate, non-discriminatory reason for Plaintiff's termination and Plaintiff cannot establish the necessary causal nexus to her alleged reports of sexual harassment." (Dkt. No. 15 at 20.)

In response, Rodriguez has attempted to show that Flow-Zone's proffered reason for her termination is pretextual. Although temporal proximity alone is insufficient to establish an issue of fact as to pretext, *Aryain*, 534 F.3d at 487, "indicia of causation may also be seen in factors such as: (1) the employee's past disciplinary record, [and] (2) whether the employer followed its typical policy and procedures in terminating the employee . . . ." *Smith v. Xerox Corp.*, 371 Fed. App'x 514, 520 (5th Cir. 2010) (citing *Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 508 (5th Cir. 1994)).

Here, the record shows that Rodriguez had no prior disciplinary history, but she was reprimanded once verbally and twice in writing the very next day after she filed her EEOC

charge. Flow-Zone contends that Rodriguez is precluded from challenging the veracity of these reprimands because she admitted to using her personal vehicle to do company business. In response, Rodriguez disputes the reprimand for tardiness because she was out making sales calls the morning she was allegedly tardy—a fact that Dulock acknowledges in the text of the warning related to using her personal vehicle.

Rodriguez has also presented evidence that Flow-Zone did not follow its own typical policy and procedures in terminating her employment. For example, it was common practice for Flow-Zone to call employees if they were late for work. (Dulock Dep., Dkt. No. 16, Ex. 16 at 17:6-10.) However, not one person attempted to call Rodriguez when she failed to show up for work following her anticipated return date. (Mingau Dep. at 61:4-6; Myers Dep., Dkt. No. 16, Ex. 18 at 11:20—12:3; Dulock Dep. at 20:13-16). Flow-Zone has attempted to rebut Rodriguez' claim that no one called her by offering a second declaration by Dulock, in which Dulock declared under penalty of perjury that when Rodriguez did not report to work on August 12 and 13, 2008, "I tried to call her but did not get in touch with her. I testified to this in my deposition for this lawsuit on page 18, lines 2-10 on February 2, 2011." (Dulock Decl. No. 2, Dkt. No. 18, Ex. B ¶ 5.) The record shows that Dulock's deposition testimony was just the opposite:

> Q: Did you by any chance try to call Ms. Rodriguez on the . . . 12th or 13th to find out why she was not at work?
>
> A: No.

(Dulock Dep. at 20:13-16.)

Rodriguez has also presented evidence that no one tried to call her treating physician or her therapist when she failed to return to work by August 13, 2008 (Mingau Dep. at 54:1-12; Dulock Dep. at 21:7-11), despite the fact that Flow-Zone had explicitly told Rodriguez she "would have to get a *doctors note* releasing [her] before [she could] report back for duty."

16

(Mingau 7/21/08 Letter to Rodriguez (emphasis added).) Although Torres' letter to Dulock stated that she "expected" Rodriguez' to be released August 11, Torres is not a doctor. Rodriguez' *doctor* advised Flow-Zone roughly a week later that Rodriguez was under his care and presently unable to work, but did not give an expected release date.

The Court recognizes that Rodriguez was not entitled to protected medical leave under the Family Medical Leave Act (FMLA),[6] nor was Flow-Zone required to hold Rodriguez' position open indefinitely if she was medically unable to perform the job. However, because Flow-Zone told Rodriguez she could not return to work without a doctor's release, a jury might question why Flow-Zone fired Rodriguez for "job abandonment/voluntary termination" without at least picking up the phone to find out if Rodriguez was able to return to work, especially given the fact that it was their customary practice to call employees if they were so much as late for their shift. A jury might also question why, despite knowing Rodriguez' absence was related to San Miguel's harassment, Flow-Zone didn't bother to inform Rodriguez that it had addressed her concerns and that San Miguel had been terminated and would no longer bother her if she returned to work.

Finally, Rodriguez has presented evidence that it was common practice for Mr. Myers to listen to the recommendation of Dulock before terminating someone's employment. (Dulock Dep at 43:20—44:14; Myers Dep. at 11:5-19.) However, in this case Myers discharged Rodriguez without Dulock's decision-making input. (*Id.*) Rodriguez has also presented evidence that Myers—the same person responsible for the termination decision—had previously told her that he was "disappointed in [her for] going to the EEOC." (Rodriguez Dep. 33:19-21.)

---

6. Rodriguez' absences from work did not qualify as protected medical leave under the FMLA because she did not work for Flow-Zone for at least 12 months and at least 1250 hours of work service. *See* 29 U.S.C. § 2611(2)(B).

17

For purposes of surviving a motion for summary judgment, it is enough that a plaintiff offer circumstantial evidence that could allow a jury to reasonably conclude that the final decision-maker responsible for the adverse employment action taken against the plaintiff was at least in part motivated by her protected activity. *See Rachid v. Jack-in-the-Box, Inc.*, 376 F.3d 305, 311 (5th Cir. 2004). Drawing all reasonable inferences in Rodriguez' favor, the Court finds that Rodriguez has met this burden, producing sufficient evidence to create a genuine fact issue as to whether Flow-Zone's proffered reason for her termination was pretextual. *See Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 43 (5th Cir. 1992) (affirming verdict in favor of employee on retaliatory discharge claim where employee was terminated only two months after dismissal of her EEOC complaint, she had no disciplinary history, incidents for which she was fired arose only after EEOC complaint had been filed, and supervisor had made disparaging comments about her EEOC complaint).

Accordingly, Flow-Zone's motion for summary judgment as to Rodriguez' retaliation claim is **DENIED**.

**IV. Conclusion**

For the foregoing reasons, Defendant Flow-Zone's Motion for Summary Judgment (Dkt. No. 15) is **GRANTED** in part and **DENIED** in part. Rodriguez' claims for workers' compensation, gender discrimination, and sexual harassment are hereby **DISMISSED**.

It is so **ORDERED**.

**SIGNED** this 29th day of June, 2011.

_____
JOHN D. RAINEY
SENIOR U.S. DISTRICT JUDGE